This is an action against the defendants, who are auctioneers and commission merchants, for having sold four bales of cotton bagging, belonging to the plaintiffs, for a price less than that limited by his orders.
At the trial, William Todd was produced as a witness for the plaintiff. Being examined on his voir dire he testified, that he was the agent of the plaintiff in relation to the cotton bagging, and had received no instructions as to the mode of selling it, or the price to be asked for it: that the plaintiff had entire confidence in him, and submitted every thing, as to the time and manner of disposing of it to his judgment: and, that he was not interested in the suit. He was objected to, as incompetent, but admitted. Being sworn in chief, he further testified, that in October, 1817, he delivered to the defendants, to be sold, five bales of cotton bagging, belonging to the plaintiff; that on the 8th of May, 1818, he gave them written instructions, by which they were forbidden to sell four of the bales under the cost-price, or fifteen cents per yard; that the defendants, three days after, sold them at auction; that he was informed of the time and place of the sale, but did not attend.
It was then proved by the defendants, that the bagging was sold at auction, to a Mr. Hinton, part for seven and part for six cents a yard ; that it was of inferior quality, and that nd more *656 could be got for it at auction, and by wholesale i but that it was afterwards retailed by Hinton, at from nine to twelve cents a yard,
It was objected by the defendants’ counsel, that the order to sell at auction for not less than a certain price, was illegal, and, therefore, that the action could not be sustained. But the court charged the jury, to find for the plaintiff the value of the four bales, at the best price which could have been obtained for them had they been sold in the most advantageous manner, and to allow the defendants no commissions on the sales. They accordingly found for the plaintiff $160.51, being at the rate of about nine cents a yard.
A motion is now made for a new trial, and the defendants’ counsel have made three points. 1st. That William Todd was an incompetent witness. 3d. That the instructions- given to the defendants were illegal. 3d. That the defendants were entitled to commission.
It is evident that the last point is a corollary to the second, and must receive the same decision. If the defendants had a right to sell without regarding their instructions, they were entitled to commissions; but if they violated their duty to their employer, then they can claim from him no compensation for doing so.
As to the admission of Todd’s testimony, it is argued, that as a general agent, he could not sell at auction; that for having done so, an action lies against him by his principal, and that he has, therefore, an interest in this suit. Supposing that he had no right to sell at auction, (which is far from being clear,) yet I think that the plaintiff, by bringing this action, has ratified Todd’s acts, and barred himself from suing him for that cause. It therefore appears to me, that he was properly admitted.
The principal point in the cause, and that which has been most laboured, is the second: viz. that it is unlawful to limit the price of an article sold at auction. To support this proposition, the case of Bexwell v. Christie, [Cowper, 395,] is relied on. In that case, the property of a person deceased had been advertised for sale at auction; and the printed conditions of sale declared, that every article should be struck off to the highest bidder. Bex *657 well sent a horse to be sold at that auction, and under those conditions of sale, but directed Christie, the auctioneer, not to let him be struck off for less than a certain sum. Christie struck the horse off to the highest bidder, for a less sum, and for this, Bexwell brought an action. Lord Mansfield supposing, that in this case, the orders of the owner could only have been complied with, by employing some one to bid on his behalf, proceeded to consider the propriety of that practice, and, thinking it immoral, held, that the action could not be sustained.
There is no other case so strong as this. It is subsequent to our revolution: and the reasoning employed in it has been doubted since in the English courts. But even in this case, it was acknowledged by Lord Mansfield himself, that the owner might, in certain cases, lawfully bid at an auction, and that an article might lawfully be set up at an auction, at a price under which it was not to be sold. Now, in the present instance, the defendants had received no instructions with respect to the manner in which the goods were to be set up: and it must be admitted, that if they could lawfully obey their instructions, they were bound todo so. If, when the four bales were set up, the auctioneer had given notice, that they were not to be sold unless fifteen cents a yard were bid for them, can it be imagined that this would have been a fraudulent transaction ? And if a proclamation to that effect was necessary to render the transaction legal, then it was the duty of the defendants to make it. They were simply directed to sell at auction for not less than a certain price; the manner of doing so was left to their own discretion, and if they published conditions of sale, making it necessary to sell for less, they violated their duty. In this view of the case, an examination of the authorities might be dispensed with. But it may not be useless to examine with some attention the doctrine contended for by the defendants, and countenanced by several decisions.
Human laws are, and necessarily must be, imperfect. It is impossible for them to control every word and action, and it is, perhaps, fortunate that they cannot. They do not attempt to enforce what are termed virtues of imperfect obligation. As *658 much as they respect truth, they take no cognizance of its transgression in an almost infinite number- of instances. Perfect rectitude is not their object; they neither suppose men angels, nor require them to act as if they were such. " Public utility is their end, and this they best consult by interfering only upon necessary occasions. It is, in general, more useful to draw the line between what is lawful and unlawful, so plain and distinct; as to be obvious to all men, than through an excessive anxiety to render it the precise boundary between right and wrong, to make it indistinct and doubtful. Certainty is deservedly a favorite with the law.
Proceeding upon these principles, the common law does not profess to relieve in every case of imposition. It requires the exercise of ordinary prudence, and refuses its aid to such as will not exert it. To those, who ask for relief against the consequences of their own sloth and supineness, it answers, vigilantibus el non dormientibus subvenid lex. To the purchaser, who complains that he has been deceived in points, where the use of his own senses Would have been sufficient to guard him from fraud, the law replies, caveat emptor. If a man, in the full possession of his faculties, will not take the trouble to examine and inquire for himself, he must submit to the consequences, not because it is consistent with morality to take an unfair advantage of the sloth or folly of another, but because it is not necessary, nor would it be - useful, for the law to act as tutor and guardian for men, who are capable of taking care of themselves. It is for the same reason, that gross disparity between the price and the value of an article sold, is not of itself a sufficient reason to vacate a contract of sale, even in a court of equity; nor will those vague and exaggerated praises which vendors are accustomed to bestow upon their wares, though ever so undeserved, authorize the vendee to annul his bargain. But if a fact, such as might have influence with a prudent man, and such as cannot be easily ascertained, be falsely asserted, the party deceived may ask for redress. It is on this ground, I apprehend, that the practice of employing puffers at auctions has been condemned, and made a ground for relief in various cases. For it is plain that a person may be intentionally *659 deceived as to a fact, though the falsehood is not asserted in words. If at an auction a number of persons are' seen bidding, even a prudent man may be influenced by that circumstance; it will lead him to believe that the article for sale is in demand) and the judgment thus expressed by others of its value, may have an effect on the estimate which he forms of it. If, then,, it should prove that these bidders are all employed by the owner, of the article, and bid only in appearance, and not in reality, a falsehood is asserted, which a by-stander has no means to detect, and a fraud is practised upon him.
In the year 1726; the House of Lords decided in the case of Walker v. Nightingale, [4 Bro. P. C. 193,] that a-person, who had been employed as a puffer, could not recover compensation for his services, since they were contrary to good faith.
In 1776, was decided the.case of Bexwell v. Christie, [Cowper, 395,] which turned on the same principle; for Lord'Mansfield there took it for granted; that the directions of the plaintiff could' only be complied with, by the employment of a puffer.
In 1796, in Howard v. Castle, [6 T. R. 642,] the same doctrine is sanctioned. There a sale was held void, it appearing that all the bidders, except the purchaser, were puffers.
In Conolly v. Parsons, in 1797, [3 Vesey, 625,] the Lord Chancellor expressed doubts as to this doctrine, in the extent to which it had been carried ; and in 1798, in Bramley v. Alt, [3 Vesey, 622,] the doctrine received a limitation, that a sale should not be vacated, merely because a puffer had been employed, if there were real bidders, who bid after the puffer had ceased to bid.
In 1806, in Smith v. Clarke, [12 Vesey, 477,] a specific performance was decreed against a vendee, although the person, who bid immediately before him was employed by the vendors, to prevent a sale under a given price; so that the doctrine received a new modification, certainly inconsistent with the opinion expressed in Bexwell v. Christie : it being now admitted, that where no fraud was intended, but a person was employed merely to prevent a sale beneath a fixed price, the transaction should not be considered fraudulent. Thus it appears that the rigid doctrine, first *660 sanctioned in Bexwell v. Christie, has been gradually softened, and made more conformable to the common notions and habits of mankind.
I shall not discuss the abstract morality of employing bidders on behalf of the owners of goods, but I think it is evident, that a mere limitation of the price of an article, to be sold at auction, is not, of itself, illegal. It is true, that for the purpose of making it bring that price, unworthy and unlawful artifices may be resorted to; but in the present case, no such artifices were contrived, or directed, by the plaintiff or his agent. He merely prohibited the auctioneer from selling for less than so much : if nobody bid so much, the auctioneer might have stopped the sale. At all events, if the instructions could in any way be lawfully complied with, (and it is admitted even in Bexwell & Christie, that they might) then the auctioneer was bound by them.
After viewing this case in every light, I remain of opinion, that the verdict is right. The motion for setting it aside, is therefore denied, with costs..